UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,        :        NO. 1:06-CV-00235
ex rel PHILIP A. TETSUWARI,      :
                                 :
        Plaintiff and            :
        Relator,                 :
                                 :        **OPINION AND ORDER**
     v.                          :
                                 :
FLUOR FERNALD, INC.,             :
                                 :
        Defendant.               :


        This matter is before the Court on the cross-motions of
the parties: Relator's Motion for Partial Summary Judgment (doc.
65), Defendant's Response in Opposition (doc. 89), Relator's Reply
(doc. 95); and Defendant's Motion for Summary Judgment as to All
False Claims Act and Retaliation Causes of Action (doc. 71),
Relator's Response in Opposition (doc. 91), Defendant's Reply (doc.
94), and Defendant's Supplemental Authority (doc. 106).  The Court
has reviewed all the briefing in this matter, as well as the
numerous exhibits and voluminous deposition transcripts.  In
addition, the Court held a hearing on such motions on December 3,
2009.  For the reasons indicated herein, the Court DENIES Relator's
motion, and GRANTS Defendant's motion, thus dismissing this matter
from the Court's docket.

**I.  Background**

        This case arises from the clean-up of the remains of the

uranium-processing facility at Fernald, Ohio, which operated from 1951 until the site formally closed in June 1991.[1] Defendant Fluor Fernald Inc. conducted the clean-up under contract with the United States Department of Energy ("U.S DOE") from 1992 to December 2006, with oversight of the U.S. Environmental Protection Agency ("U.S. EPA"), the Ohio Enviromental Protection Agency ("Ohio EPA"),(collectively, "the EPA's") and planning input from the Fernald Citizens Task Force. The U.S. DOE contracting officer's representative oversaw each of the remediation projects and U.S. DOE project managers worked on each project on a full time basis, sharing offices with Defendant and providing oversight. The clean-up was governed by Records of Decision signed between the U.S. EPA and the U.S. DOE that set forth selected remedies at the site. Principally at issue in this case: the removal of two concrete silos that stored radioactive material, the contents of the silos, and the contaminated soils under and around the silos.[2]

---

[1]This Court is very familiar with the Fernald site, having presided over <u>Crawford v. N.L.O.</u>, (<u>In re: Fernald Litigation)</u> 1:85-CV-00217 ("Fernald I"), <u>Day v. N.L.O.</u>, 1:90-CV-00067, ("Fernald II"), and <u>State of Ohio ex. rel v. DOE</u>, 1:86-CV-00217.

[2]The entire site clean up was organized into five "operable units" ("OU's") based on location, physical characteristics, and potential for using similar technologies during clean up. OU1 and OU2 involved waste pits, a landfill, and sludge ponds, OU3 involved the former production area, and OU4 involved: four concrete waste silos, (Silos 1-4, their contents, berms, and Decant Sump Tank System); Radon Treatment System, a portion of concrete trench and Silos 1 and 2 material transfer line within the boundary of OU4, miscellaneous pads and concrete structures; soils immediately beneath and immediately surrounding Silos 1-4,

The clean-up was conducted under a "balanced approach," in which the most dangerous highly radioactive materials were to be taken off site, while the much larger volume of lower radioactive materials was to be stored in a sealed on-site disposal facility ("OSDF"). So as to ensure compliance with the balanced approach, the U.S. DOE developed a Waste Acceptance Criteria Attainment Plan ("WAC") for the OSDF, which governed specifically what materials could qualify for on-site disposal, and which materials would have to be shipped away. Essentially, Defendant removed the Silos for off site storage, took three feet of soil under and around the Silos for off site storage, and then excavated the next thirty feet of soil for storange in the OSDF.

In his Amended Complaint, Relator, who was responsible for monitoring airborne radioactive contamination at the facility, alleges Defendant violated contract provisions excluding Radium-226 from two silos from ending up in the OSDF, and for generating and failing to report non-ALARA ("as low as reasonably achievable") radioactive emissions (doc. 9). Relator further alleges Defendant made false statements and false certifications with respect to the

---

and perched groundwater in the vicinity of the Silos that may be encountered during the implementation of cleanup activities. OU5 consisted of all environmental media not associated with the preceding operable units, including soil not included in the definitions of OU's 1 through 4. Relevant to Relator's claims are Silos 1 and 2 in OU4 which are governed by the 1994 Final Record of Decision for Remedial Actions at Operable Unit 4, and the June 2000 Record of Decision Amendment, as well as soils governed by the OU5 Record of Decision.

Silos Project Remediation Exhaust Stack, which failed to comply with National Emission Standards for Hazardous Air Pollutant ("NESHAP") limits, and that Defendant retaliated against him for his reporting of the alleged contract violations by terminating his employment (Id.).

At the hearing and in its briefing, Defendant emphasized that in his Complaint, Relator has falsely alleged that Radium-226 is prohibited from disposal in the OSDF, and as such, Relator has been forced to shift his argument to attacking the presence of "silo contents" from disposal in the OSDF, which he contends were categorically excluded by the WAC. Defendant completely denies any false claims or retaliation liability in this matter, contends the clean-up site was highly-regulated, and argues that the EPA's and the DOE were fully aware of Defendant's conduct at Fernald and expressly approved of it (doc. 71). Defendant further contends that Relator's retaliation claim fails for lack of evidence that it terminated him for protected activity, and in any event, Relator was let go as a part of a planned workforce reduction (Id.).

## II.  Statutory and Legal Background

### A.  The False Claims Act

In 1863 President Lincoln signed the original False Claims Act into law in order "to combat rampant fraud in Civil War defense contracts." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968), S. Rep. No. 99-345, at 8, reprinted in 1986

4

U.S.C.C.A.N. 5266, 5273 (1986). In its current form, the FCA imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States government. . .a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(2010). The Act provides for civil penalties of not less than $5,500 and not more than $11,000 per false claim of payment, plus three times the amount of damages which the government sustains because of the act of the person presenting the claim. Id., 28 C.F.R. 85.3(9)(2010)(adjusting the penalties pursuant to the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, effective on or after September 29, 1999).

Parties who enter into a contract with the government "are held to the letter of the contract–irrespective of whether the contract terms appear onerous from an ex post perspective, or whether the contract's purpose could be effectuated in some other way–under the maxim that 'men must turn square corners when they deal with the Government.'" <u>United States ex rel. Varljen v. Cleveland Gear Co., Inc.</u>, 250 F.3d 426, 430 (6th Cir. 2001), <u>quoting</u> <u>United States v. Compton v. Midwest Specialties, Inc.</u>, 142 F.3d 296, 302 (6th Cir. 1998). The purpose of the False Claims Act is "broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, or the Government instrumentality upon which such claims were

made." <u>Rainwater v. United States</u>, 356 U.S. 590, 592 (1959). It was "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." <u>United States v. Neifert-White Co.</u>, 390 U.S. 228, 232 (1968).

The False Claims Act does not require an expressed false statement to establish liability, but rather, liability may be premised on claims for payment if such claims incorrectly represent that the contracted-for services conform to the terms and specifications of the contract. <u>Compton</u>, 142 F.3d at 301, 304. Additionally, the requirement that a Defendant acted with knowledge in presenting a false claim may be met where a Defendant remains deliberately ignorant about whether it is satisfying contract obligations. <u>United States v. Entin</u>, 750 F. Supp. 512, 518 (S.D. Fla. 1990).

## B. The Summary Judgment Standard

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464 (1962); <u>LaPointe v. United Autoworkers Local 600</u>, 8 F.3d 376, 378 (6th Cir. 1993); <u>Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and</u>

<u>Mental Health Servs.</u>, 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam).   In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Fatton v. Bearden</u>, 8 F.3d. 343, 346 (6th Cir. 1993), <u>quoting in part</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and non-movant are well settled.   First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see</u> <u>also</u> <u>LaPointe</u>, 8 F.3d at 378; <u>Garino v. Brookfield Township Trustees</u>, 980 F.2d 399, 405 (6th Cir. 1982); <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989).   The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. <u>See</u> <u>Barnhart v. Pickrel, Shaeffer & Ebeling Co. L.P.A.</u>, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support

of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough

specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991).

III. **The Parties' Arguments**

The parties argued at the December 3, 2009 hearing regarding Relator's principal False Claims Act claim, his

allegation that Defendant placed silo content material in the OSDF in breach of its contract with the DOE, and also regarding Relator's retaliation claim. In their papers, the parties further argued regarding additional theories related to Relator's expert's opinion, ALARA, and NESHAP standards. The Court will address the False Claims Act theories first, and then proceed to Relator's retaliation claims.

### A. Relator's Claim that Defendant Improperly Placed Silo Content Material in the OSDF.

Relator explained at the December 3, 2009 hearing that Defendant had a contract obligation to ensure that all content material from Silos 1 and 2 were categorically excluded from the OSDF, that Defendant knew that such content material got into the soil during the demolition process of the silos, and that Defendant nonetheless put that soil into the OSDF without ensuring the removal of the content material. Relator argued that because Defendant kept sending claims for payment to the Department of Energy that claimed they were adhering to all contract terms, Defendant violated the False Claims Act as a matter of law.

Relator showed an aerial photograph of the clean-up site, pointing out air monitors at the Silos and at the OSDF that Relator, as an environmental scientist working for Fluor Fernald, used to track quantities of radon and radium particulates. Relator stated that after the Silos were removed from the site, he noticed readings of lethal quantities of radium-226 in the area where the

silos used to be. He further stated that as the soil was transported from the silo area to the OSDF, the readings for radium-226 went up at the OSDF area.

Relator argued that it is Defendant's burden to prove that no categorically-excluded Silo content materials ended up in the OSDF, but that they cannot do so. Relator stated that during the demolition process of the silos, Defendant used water under high-pressure to hose down the silos, and such water took silo contents and drove them into the soil. Relator claimed that Defendant merely made visual inspections to ensure the removal of content material, and once the three feet of soil under and around the silos was removed, Defendant stopped looking for content material, and simply put the rest of the soil in the OSDF. Relator argued, "The ensuring of content material not going into the on-site disposal facility is not documented anywhere."

Relator argued that after the three feet of soil was skimmed off, he sent an email to his superiors alerting them about lethal quantities of radium that his air monitors were displaying. In response, his superior told him, "I'd be careful with my use of terms like 'lethal quantities,'" to which Relator replied, "I was."

Defendant responded at the hearing that Relator mischaracterizes the record. First, Defendant argues that the WAC in no way put limits on radium that could be stored in the OSDF because radium, unlike 18 listed contaminants of concern, is not

soluable and poses no risk of migrating to the water table. Defendant argued the air monitors Relator used were for worker protection, and that each load of soil that went into the OSDF was measured with a hand-held geiger-counter device to ensure that none of the WAC contaminants at prohibited levels ended up in the OSDF. Although Relator claimed that there is no documentation regarding content material ending up in the OSDF, Defendant responded that it has documentation regarding each load of soil that went into the OSDF, showing compliance with the WAC.

Defendant said the contents of the silos were taken out of the silos for off-site disposal, and moreover, the silos were washed out with water, that was ultimately suctioned out and taken to the mediation building for off-site disposal. Defendant indicated that the demolition process, by plan, involved water, so as to keep contaminants from becoming airborne. Defendant further indicated that the silo content material, by its very nature, was of a distinctive whitish/grayish color, such that it was easy to identify and remove. Moreover, Defendant indicated, there is no dispute that all the parties involved knew that soil under and around the silos had been contaminated through the years and that the "constituents of concern" from the prior contamination were essentially the same as those that got on the soil with water during the dust suppression process. Defendant argued the problem in this case is that Relator seeks to expand the term "contents"

well beyond anything that the parties to the contract agreed upon. Defendant contends that even the DOE, and the EPA's agree with Defendant as to its view that it successfully removed the silo contents and complied with its contract.

In its briefing, Defendant further states that after it skimmed and removed the two to three feet of soil from below the silos, it scanned the surface for any "hot" spots, and removed those as well (doc. 94). Defendant then used real-time scans to measure the remaining soil during excavation, which yielded recordings of an average level of radium at 10 to 20 pico-Curies/gram (pCi/g), with the highest level at 550 pCi/g (Id.). Defendant contends the DOE's 1993 Remedial Investigation Report for Operable Unit 4 shows the DOE knew that contaminated soil under the silos had radium levels recorded as high as 876 pCi/g, but that it nonetheless provided that so long as soil met the WAC criteria, it could be disposed of in the OSDF (doc. 89, fn. 10). As such, Defendant argues, the soil that actually went into the OSDF had lower levels of radium than that anticipated by the DOE (Id.). Moreover, Defendant contended at the hearing, these radium levels are all dwarfed by the levels of radium in the actual silo contents, which measured 890,000 pCi/g. In summary, Defendant argued, "there simply can't be a false claims case when the government says we were not deceived; we knew what was going on."

Relator's counsel replied with intensity that none of the

plans for remediation contemplated the spilling of silo contents into the soil as a result of the water suppression process. In Relator's view, Defendant is taking the fact that there was pre-existing contamination in the soil as license to add additional contamination from silo contents, which were categorically excluded by the contract. "We are not trying to expand the definition of contents," argued Relator, "The DOE and Fluor Fernald did not agree that the definition of contents would be contents that are simply in the silos. If that were the case, if contents meant the stuff inside the silos, why is this company looking for it in the soil after the silos are taken down and shipping it off site? That makes no sense Judge. And that's because silos contents remain silos contents even after it gets in the soil."

Having reviewed this matter, the Court finds Defendant's position well-taken that there is no breach of contract requirements here based on Relator's allegations. No reasonable jury could find Defendant improperly stored silo content materials in the OSDF when there is no dispute regarding the fact that there was no limit on the amount of radium allowed in the OSDF, when there is no dispute that the measurements of radioactivity of the contaminants actually placed in the OSDF were miniscule in relation to the measurements of radioactivity of content materials, and where all of the government actors knew about and planned for the very actions that Defendant took. Defendant "turned square

corners" with respect to its duties under the contract when it removed the silo contents, washed down the silos and collected the run-off, and skimmed away some three feet of soil immediately under the silos for off-site storage.  After such skimming, Defendant further measured for "hot spots," which it removed, and it analyzed and documented every shipment of soil to the OSDF according to the WAC criteria.  These facts do not show Defendant acting quickly in a sloppy fashion so as to gain incentive payments, but rather show a methodical compliance to pre-planned remedial actions.  Nor do these actions show Defendant using the fact of pre-existing contamination as a license to improperly allow content material to end up in the OSDF.  Relator's viewpoint fails to account for the fact that all parties understood that soil under and around the silos had such pre-existing contamination, which obviously originally came from the silos.  For this reason, Defendant looked for contaminants in the soil after the silos were taken down, and, contrary to Relator's argument, this makes sense.  Relator presumes that his air monitor readings prove that silo contents were placed in the OSDF, but such readings only show that radium-226, which under the WAC was permitted in the OSDF, made it to its planned destination.  Accordingly, the Court finds no genuine dispute of material fact that Defendant complied with its contractual obligations, and finds no basis for Relator's False Claims Act claim based on his incorrect view that Defendant improperly placed

contaminated soil in the OSDF.

**B. Relator's expert**

Relator proffers expert testimony of Dr. Bullen, who opines that Defendant failed to account for the speed with which radioactive material would infiltrate down from the OSDF into the Great Miami Aquifer. Dr. Bullen opines that Defendant's modeling calculations failed to account for "fracture networks" in the gray clay geologic layer beneath the Fernald site. Defendant attacks Dr. Bullen's testimony as wrong, and further argues that the government's direct involvement in the modeling negates any possibility of a false claim. Defendant proffers deposition testimony that DOE representatives assisted with, reviewed, and evaluated such modeling, that the Ohio EPA hired a consultant to review and consult on the modeling, and that the U.S. EPA's subcontractor reviewed the modeling as well. Relator responds that Defendant fails to squarely address Dr. Bullen's testimony, and that in any event, the government relied on Defendant's modeling and only had general oversight roles.

The Court agrees with Defendant that the government was fully aware of the modeling and the design of the OSDF such that there is no basis for a false claim here. Moreover, the Court has reviewed the deposition testimony of Dr. J.D. Chiou, the manager of the clean up at the site, and such testimony shows the modeling was subjected to intense review over four years by both government and

non-government experts.   Dr. Chiou's testimony further explains in great detail the many-layered design of the OSDF, its cap, and its leachate collection and detection system, which assures the Court that Defendant's construction of the OSDF complied with its contract and protects public safety (doc. 61).

## C.   ALARA Standards

Relator indicates that after Silos 1 and 2 were demolished, there was an expectation that there would be a one-time airborne release of radioactive material, which occurred (doc. 91). Relator monitored a spike in the readings, and he states such spike was reported to the government (Id.).   However, Relator alleges there was an unexpected second spike, which Defendant failed to report to the government (Id.).   Relator alleges Defendant's failure to report and mitigate the spike violated its contractual duty to bring radon emissions from the silos to a level as low as reasonably achievable ("ALARA")[3](Id.).

Defendant responds that Relator fails to identify any emissions that exceeded the government-approved ALARA plan.

---

[3]"ALARA," meaning "as low as reasonably achievable," is defined by 10 C.F.R. § 20.1003 as "making every reasonable effort to maintain exposures to radiation as far below the dose limits in this part as is practical consistent with the purpose for which the licensed activity is undertaken, taking into account the state of technology, the economics of improvements in relation to the state of technology, the economics of improvements in relation to benefits to the public health and safety, and other societal and socioeconomic considerations, and in relation to utilization of nuclear energy and licensed materials in the public interest."

Defendant indicates that the maximum radon concentration during silos demolition activities of 36 pCi/L on April 28, 2005 (the "first spike") did not exceed any of the limits in the ALARA plan, the "second spike" was even lower.

Although the Court disagrees with Defendant's contention that ALARA is such a vague standard that it cannot support a false claim, it finds no contract violation here, where it is undisputed that the "second spike" was well within the limits contemplated by the government-approved ALARA plan. Clearly, the DOE and the EPAs expected increased contaminant emissions during the demolition process, and they agreed that "short term exceedences of 100 pCi/L radon concentration" during demolition should be reported. Such level was never exceeded. Accordingly, the Court rejects Relator's claim that Defendant failed to comply with the ALARA regulation.

**D. NESHAP Monitoring**

Relator also alleges that Defendant failed to monitor the exhaust stack on the Remediation Building (the building that processed waste on-site for removal) in accordance with the National Emissions Standards for Hazardous Air Pollutants ("NESHAP"), Subpart H of 40 C.F.R. Section 61, which regulates radionuclide emissions and related monitoring requirements at DOE facilities (doc. 9). Pursuant to NESHAP standards, a source of emissions must be monitored if it is projected to have an impact on the environment of over 0.10 millirem per year (Id.).

Relator alleges that in April 2003, Defendant published its "Final Remedial Design Package" for the Remediation building, in which it projected Remediation Building exhaust stack emissions as high as 430 millrem/year (doc. 91). As such, Relator contends the stack should have been subject to monitoring under NESHAP standards (<u>Id</u>.). However, Relator alleges that in October 2003 Defendant had its subcontractor re-do the projections so as to lower the projected emissions to 0.03 millirem/year, and to thus eliminate the need for NESHAP monitoring (<u>Id</u>.). Relator further contends that Defendant should have considered actual emissions as opposed to potential emissions, and claims Defendant used an outdated Clean Air Act NESHAP monitoring standard to avoid the more stringent requirements of the correct standard (<u>Id</u>.).

Defendant attacks Relator's claims, contending that the NESHAP standard on its face relates to potential emissions before they occur so as to determine the type of monitoring that is necessary (doc. 94, <u>citing</u> 40 C.F.R. § 61.93(4)(ii)(2002)). As such, Defendant contends Relator's argument that it should have considered actual emissions is off the mark. Defendant further argues that there is no evidence that its model did not comply with NESHAP, nor evidence of any actual emissions above 0.10 mrem/year (<u>Id</u>.). In fact, Defendant contends, it has provided evidence from its subcontractor who analyzed monitoring data from the Remediation Stack, which shows that radium emissions were non-detectable (<u>Id</u>.).

Finally, Defendant argues that Relator's argument regarding the applicable NESHAP standard is nothing but a red herring, because the stack simply was not required to be monitored under NESHAP (<u>Id</u>.).

Having reviewed this matter, the Court finds Defendant's position well-taken that there is no evidence that it violated NESHAP standards by failing to monitor the exhaust stack at the remediation building. Relator proffers no evidence that actual emissions exceeded the prescribed level, and in fact, Defendant provides evidence that they did not. As such, no reasonable jury could find for Relator on this issue, and the Court finds such claim lacking in merit.

**E. Relator's Retaliation Claim**

As a final matter, Relator alleges that in response to his complaints regarding what he viewed as regulatory and contractual compliance violations, Defendant terminated his employment. Relator further alleges in his Response that Defendant effectively blocked his employment with the legacy management company that assumed control over the clean-up site after Defendant wound up its activity (doc. 91).

To prove a retaliation claim under 31 U.S.C. § 3730(h) of the False Claims Act, an employee must show (1) that he engaged in protected activity in furtherance of an action under § 3730, (2) that the employer knew about the protected activity, and (3) that

20

the employer discharged or otherwise discriminated against the employee as a result of the protected activity. <u>U.S. ex rel. McKenzie v. Bell South Telecommunications, Inc.</u>, 123 F.3d 935, 944 (6th Cir. 1997). Defendant challenges each prong of Relator's retaliation case, contending the facts show Relator did not engage in protected activity, nor did it have any reason to believe Relator was contemplating a False Claims Act action. Finally, Defendant contends the evidence does not show it terminated Relator's employment due to protected activity, but rather that the clean-up project was winding down, and the very day Relator's employment ended, so did that of 46 others, including Relator's manager. Moreover, Defendant argues the facts show it terminated Relator's employment later than originally planned, and it was not involved in the hiring decisions of the legacy management contractor, S.M. Stoller, Inc. (doc. 94).

Relator contends that according to the Sixth Circuit, Congress intended for protected activity under Section 3730(h)(1) to "be interpreted broadly," and that protected activity "must relate to 'exposing fraud' or 'involvement with a false claims disclosure'" (doc. 91, <u>citing</u> <u>McKenzie</u>, 123 F.3d at 944, and <u>United States ex rel. McKenzie</u>, 219 F.3d 508, 514 (6th Cir. 2000)("McKenzie II")). As such, contends Relator, internal reporting may constitute protected activity if the internal reports allege fraud on the government (<u>Id</u>. <u>citing</u> <u>McKenzie II</u> at 514). Because

Relator clearly engaged in internal reporting of what he observed as regulatory and contract compliance violations, Relator argues he engaged in qualifying protected activity.

As for whether Defendant knew Relator was engaged in protected activity, Relator argues it is not necessary for the employee to know the particulars of the False Claims Act or use appropriate language when internally reporting wrongdoing. Instead, contends Relator, the employee "must set forth some connection to fraudulent or false claims against the federal government." (Id. quoting McKenzie II, 219 F.3d at 518). Here, because Relator repeatedly told his supervisor that Defendant's actions violated regulatory and contractual provisions, he contends he easily meets the second prong of showing Defendant knew he was engaged in protected activity (Id.).

As for the third and final issue, whether Defendant discriminated against Relator for his protected activity, Relator argues a reasonable jury could conclude he was terminated unjustly because of his repeated warnings to his supervisors, including having stated that "the activity that was going on here was the kind of activity that U.S. Marshals show up there at the gate with handcuffs" (Id.). Indeed, he argues, just before his termination he refused to sign a NESHAP compliance report that he alleged contained false statements (Id.). Relator further argues that as one of the "key personnel" in making hiring decisions for the

legacy management company was one of Defendant's supervisors to whom he had previously been complaining, he was not hired by such company although he should have been (Id.).

Having reviewed this matter, the Court finds well-taken Defendant's position that it terminated Relator's employment as a part of a planned workforce reduction in the context of a project that it was winding down. Although the Court agrees with Relator's position that he can be viewed to have been engaged in protected activity under Sixth Circuit precedent, and that his Complaints were adequate to put Defendant on notice of his activity, the facts do not show that Defendant retaliated against him for any such activities. Further, though the Court accepts Relator's position that Defendant could in theory meddle with his future employment prospects, such theory is not supported by the facts here. Defendant did not provide a negative employment reference for Relator. The fact that a decision-maker for the legacy company previously worked for Defendant does not mean that such person's hiring decision can be attributed to Defendant. For these reasons, the Court finds no viable retaliation claim.

## IV. Conclusion

Despite a spirited and skilled defense by Relator's counsel, the Court simply does not find merit to Relator's claims that Defendant violated the False Claims Act or retaliated against Relator for having blown the whistle regarding such allegations.

23

The facts show that the clean-up site was highly regulated by the EPAs, that the DOE knew and approved of Defendant's methodology, and that the government believes Defendant met all of the requirements of its contract. As such, no reasonable jury could find for Relator, and Defendant is entitled to judgment as a matter of law. Accordingly, the Court DENIES Relator's Motion for Partial Summary Judgment (doc. 65), and GRANTS Defendant's Motion for Summary Judgment as to All False Claims Act and Retaliation Causes of Action (doc. 71), thus dismissing this matter from the Court's docket.

       SO ORDERED.


Dated: May 5, 2010         /s/ S. Arthur Spiegel
                                   S. Arthur Spiegel
                                   United States Senior District Judge